# IN RE: A SPECIAL INVESTIGATION NO. 228

[No. 318, September Term, 1982.]

*Decided April 7, 1983.*

The cause was argued before MOYLAN, LOWE and ADKINS, JJ.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Stefan D. Cassella, Assistant Attorney General,* on the brief, for appellant.

*David R. Addis,* with whom were *Dickstein, Shapiro & Morin* and *Albert H. Turkus* and *Dow, Lohnes & Albertson* on the brief, for appellees.

MOYLAN, J., delivered the opinion of the Court.

a. *A wealthy art connoisseur is charged with manslaughter. Dried blood of the victim's blood type and the victim's fingerprint are found on an invaluable Ming vase in the art collector's home. Prior to trial, the art collector objects to the police seizure of the Ming vase, not upon constitutional grounds but on the grounds that it is his property. He is unsuccessful. Following his conviction, the art collector moves for the restoration of his Ming vase, which is still being retained in the property room.*

b. *A pawnbroker is acquitted of having received stolen goods after it is determined that the police seizure of the goods was flagrantly unconstitutional. Notwithstanding the acquittal, the true owners request the police to restore the stolen chattels directly to them. The pawnbroker counterclaims that the finding of an unconstitutional seizure automatically entitles him to a restoration of the chattels that were unconstitutionally seized.*

c. *A wealthy cocaine dealer, following his acquittal, moves for the return of $100,000 worth of high-grade "coke" seized from his yacht. Does the acquittal make a difference? Will the outcome hinge on whether the cocaine was seized constitutionally or unconstitutionally?*

d. *A bookmaker is acquitted when the money from his wall safe is determined to have been unconstitutionally seized. Notwithstanding the exclusion of the evidence and the subsequent acquittal, the IRS seeks the forfeiture of the funds.*

e. *A 17-year-old hot-wires a $75,000 Rolls Royce for an evening of elitist "joyriding," is apprehended behind the wheel, is promptly indicted, and just as promptly "jumps bail." The police, hoping for his eventual recapture, feel compelled to hold onto the evidence. The owner, reduced to taking the bus, insists upon the repossession of his Rolls Royce pending possible recapture and trial.*

The purpose in posing the hypothetical problems is to illustrate the frequently neglected point that personal property law is not coterminous with constitutional law — that the entitlement to have personal property (which may coincidentally be evidence) returned is not coterminous with the right to have excluded from one's criminal trial evidence (which may coincidentally be one's personal property). A property right in a chattel (which may become, is now, or once was evidence) did not arise from the first promulgation of the Exclusionary Rule. A property right in a chattel (which may become, is now, or once was evidence) would not expire if the Exclusionary Rule were to be abolished tomorrow.

The property right and the constitutional right have available separate avenues of vindication. The troubling problem is that those avenues are for a part of their respective courses deceivingly parallel, even share briefly a common roadbed, but then diverge dramatically. Our statutory law and our case law have sadly failed to keep the distinction clean.

This appeal arises from a blurring of that distinction. It concerns whether Md. Ann. Code Art. 27, § 551 (1982 Repl. Vol.) was intended by its framers to be a statutory scheme to settle, in part at least, possessory rights or was designed to settle constitutional questions, or is a formless muddle of both.

### § 551 In A Nutshell

Section 551, in pertinent part, provides:

"(a)

### [The Issuance of the Warrant]

Whenever it be made to appear to any judge . . . by written application signed and sworn to by the applicant, accompanied by an affidavit . . .

containing facts within the personal knowledge of the affiant . . . that there is probable cause, the basis of which shall be set forth in said affidavit . . . to believe that any misdemeanor or felony is being committed by any individual or in any building, apartment, premises, place or thing within the territorial jurisdiction of such judge, or that any property subject to seizure under the criminal laws of the State is situated or located on the person of any such individual or in or on any such building, apartment, premises, place or thing, then the judge may forthwith issue a search warrant directed to any duly constituted policeman . . . authorizing him to search such suspected individual, building, apartment, premises, place or thing, and to seize any property found liable to seizure under the criminal laws of this State, provided that any such search warrant shall name or describe, with reasonable particularity, the individual, building, apartment, premises, place or thing to be searched, the grounds for such search and the name of the applicant on whose written application as aforesaid the warrant was issued,

### [The Execution of the Warrant]

and provided further that any search or seizure under the authority of such search warrant, shall be made within 15 calendar days from the date of the issuance thereof and after the expiration of the 15-day period said warrant shall be null and void.

### [The Sanction for Certain Non-Compliances]

If, at any time, on application to a judge . . . it appears

[1] that the property taken is not the same as that described in the warrant

[2] or that there is no probable cause for believing the existence of the grounds on which the warrant was issued,

[3] or that the property was taken under a warrant issued more than 15 calendar days prior to the seizure,

said judge must cause it to be restored to the person from whom it was taken. . ."

[Restoration of Property Where the Criminal Case Is Terminated Prior to Trial or By Acquittal]

"(b) If the criminal case in which property of a person was seized pursuant to a search warrant issued under subsection (a) of this section is disposed of because of (i) an entry of nolle prosequi, (ii) dismissal, or (iii) acquittal, or if the State does not appeal such a criminal case or if the time for appeal has expired, all property of the person, except contraband or any property prohibited by law from being recoverable, may be returned to the person to whom it belongs without the necessity of that person instituting an action for replevin or any other legal proceeding against the agency having custody of the property.

[Restoration of Property Wrongfully Withheld When It Is No Longer Needed]

(c) (1) If, at any time, on application to a judge . . . it is found that property rightfully taken under a. search warrant is being wrongfully withheld after there is no further need for retention of the property, the judge must cause it to be restored to the person from whom it was taken."

## The Present Case

Beginning in August, 1981, the Baltimore City Grand Jury began an investigation of large-scale fraud in the Medical Assistance Program run by the State of Maryland. The investigation was conducted by the Medicaid Fraud Control Unit of the Office of the Attorney General of Maryland. The particular investigation now in issue was of a here-undesignated nursing home (the Nursing Home) and a here-undesignated hospital (the Hospital) in a large suburban county somewhere in Maryland,[1] and the owners, administrators, and employees of both.

During the period between August, 1981 and February, 1982, numerous witnesses were called before the Grand Jury to testify or to produce documents. As of February 4, 1982, the Attorney General developed probable cause to believe that certain documents previously subpoenaed by the Grand Jury, but not turned over to it, were being kept in a boiler room at the Hospital. Acting pursuant to a lawfully issued search warrant, agents of the Attorney General conducted a search of the boiler room on February 4 and seized numerous books and records which had previously been subpoenaed by the Grand Jury. There is no dispute as to the propriety of that search of February 4.

As productive as the search may have been, it was presumably not as productive as it might have been. When an undercover agent informed the Attorney General of the frantic and highly suspicious scurrying about that immediately preceded the search of February 4, the predicate was laid for a follow-up search on February 5. A courtesy call from the Attorney General to counsel for the suspect Hospital had alerted the Hospital that the February 4 search team was on the way. Within the hour or so

---

1. If the factual discussion appears vague, it is deliberately so. We are operating under an order to seal the record, filed by this Court on April 28, 1982, which provides, *inter alia*, that we refer to both individuals and institutions "in a non-identifying manner." Short of rendering our opinion unintelligible, we shall attempt to do so.

preceding the arrival of the searching party, six or more employees of the Hospital were observed hastily removing boxes of records from the administrative office of the Hospital, loading them onto a pickup truck, and moving them to a barn some distance away. On February 5, armed with a new search warrant, the Attorney General searched the barn and seized thirty-five boxes of books and records, these being the boxes which had been removed in great frenzy from the administrative office of the Hospital just prior to the arrival of the original searching team on the day before.

## The Holding in a Nutshell

Before beginning the painful parsing of the almost hopelessly tangled series of orders, amendments to orders, and injunctions involved in this case, we will state in advance "the bottom line." The package of orders required the State to return the property seized on February 5, 1982 to counsel for various suspects and forbade the State, even prior to the physical return, to examine and to inspect the property and to use the information thereby gained even in a derivative way. The State has appealed this denial of the right to use, directly or indirectly, the evidence seized on February 5. Because of multitudinous substantive and procedural errors all working to the detriment of the State, we will vacate the orders in this case.

As we begin the effort to be more particular in our analysis, the biggest impediment is the confusing intermingling of Art. 27, § 551 and the Fourth Amendment's Exclusionary Rule.[2] The doctrinal eggs have been so thoroughly scrambled, that it calls for a Herculean effort even to try to unscramble them. Before reciting the history of the motions and orders in this case, it is necessary to try to make clear the frequently blurred distinction between § 551 and the Exclusionary Rule.

---

**2.** The specific protection of the federal Fourth Amendment is part of the due process clause of the Fourteenth Amendment and thereby applies to the

## The Exclusionary Rule, as Distinguished from Art. 27, § 551

The Exclusionary Rule deals exclusively with matters of constitutional dimension; § 551 deals in part with infractions that are of less than constitutional stature. The Exclusionary Rule concerns only improper searches and seizures; two of the three situations in which § 551 requires the return of seized property concern proper searches and seizures. The Exclusionary Rule deals with warrantless searches as well as with those conducted under authority of a warrant; § 551 deals only with searches executed under a warrant. It does not have the remotest bearing upon warrantless searches, be they legal or illegal, constitutional or unconstitutional. (Indeed, the very section in question is codified under the subtitle of "Search Warrants").

The Exclusionary Rule is not remedial in intent but serves a prophylactic purpose of general deterrence, aimed at curbing future police misconduct, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); § 551 is exclusively remedial in purpose and is concerned with restoring a right of possession to one wrongfully deprived of that right. The Exclusionary Rule covers such intangibles as things seen and conversations overheard. *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); § 551 covers only goods and chattels. The Exclusionary Rule regulates only the admissibility of evidence at a criminal trial, *Warden v. Hayden,* 387 U.S. 294, 305, 87 S.Ct. 1642, 18 L.Ed.2d 782, 791 (1967); § 551 regulates possessory rights before trial, after trial, or where no trial ever takes place.

---

states. Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). To implement the Fourth Amendment guarantee, the Supreme Court has mandated that, under certain circumstances, the Exclusionary Rule is also binding upon the states. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Maryland has no exclusionary rule of its own. Even the limited exclusionary rule for nonexempted misdemeanors enacted by the so-called Bouse Act (Chapter 194 of the Acts of 1929) and codified until 1973 as Art. 35, § 5, was repealed by the Acts of 1973, 1st Sp.Sess., ch. 2, § 2.

The Exclusionary Rule forbids derivative use under the "fruit of the poisonous tree" doctrine, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); § 551 mandates only the return of possession and has no concern with derivative use. The Exclusionary Rule bans unconstitutionally seized contraband as well as any other variety of evidence, *Warden v. Hayden,* 387 U.S. at 307-308, 18 L.Ed.2d at 792; § 551 does not compel the return of contraband, no matter how unconstitutional or otherwise illegal its seizure may have been. *Board of Police Commissioners v. Wagner,* 93 Md. 182, 48 A. 455 (1901); *Wagner v. Upshur,* 95 Md. 519, 52 A. 509 (1902).

One has standing to invoke the Exclusionary Rule only as a defendant in a criminal case. *United States v. Salvucci,* 448 U.S. 83, 86-88, 100 S.Ct. 2547, 65 L.Ed.2d 619, 624-625 (1980). Thus, one whose personal property is unconstitutionally seized has no standing where the seized property is used against someone else. *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). By way of contrast, one is entitled to invoke the remedy of § 551 even if one is not the defendant and even if the chattel seized from him is to be used against, or has been used against, someone else. *Novak v. State,* 195 Md. 56, 72 A.2d 723 (1950). One is not, however, entitled to invoke § 551, even as a defendant, if the evidence in question was unconstitutionally seized from the possession of another.

One need not have a right to possess the chattel to have standing to invoke the Exclusionary Rule; it is enough to have been legitimately present on someone else's premises, *Cecil Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); it is enough to have a possessory interest in the place searched even without a possessory interest in the thing seized. By way of contrast, one's entitlement to invoke § 551 depends upon the rightful possession of the personal property in question.

Even if one has standing to invoke the Exclusionary Rule, such standing will only entitle him to have unconstitutionally seized evidence excluded from the State's

case in chief on the merits of guilt or innocence; one is not entitled to have the evidence excluded from a civil trial, *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); one is not entitled to have the evidence excluded from a grand jury, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); one is not entitled to have the evidence excluded when it is offered in rebuttal for purposes of impeaching the defendant's testimonial credibility, *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), and *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). By way of contrast, the rightful possessor of personal property may sometimes be entitled to its return under § 551, regardless of the forum in which it is to be used and regardless of whether the use contemplated is on the merits of guilt or innocence or is only to impeach testimonial credibility.

The contours of the Exclusionary Rule bear little resemblance to those of § 551 beyond the obvious fact that they both deal with the subject of search warrants.

### *Art. 27, § 551, as Distinguished from the Exclusionary Rule*

What is now Art. 27, § 551 was first enacted by the General Assembly in 1939.[3] The limited utility of the section was apparent in two regards. The very titling of the bill referred to an act "relating to the issuance of search warrants." It did not touch in the obliquest fashion the vast majority of searches and seizures, which were and are conducted warrantlessly.

The second aspect of the limited utility tied in with the first. In 1939, search warrants were not routinely resorted to for the investigation of crimes of violence or for more serious crimes generally. The reason for this was obvious; Maryland had no exclusionary rule for felonies and for many of the

---

3. Ch. 749 of the Acts of 1939. It was then codified as Art. 27, § 259A.

more serious misdemeanors. The partial exclusionary rule which the General Assembly had enacted in 1929 (the so-called Bouse Act)[4] applied only to the less serious, nonexempted misdemeanors — classically, cases of bootlegging and gambling. With the Repeal of Prohibition in 1933, gambling violations alone remained as the hard core of the crimes covered by the Bouse Act. These were the cases wherein the police regularly obtained search warrants. Indeed, the early placement in the Code of the new law was, until 1958, under the subtitle "Gaming."

It is clear that the new law did not seek to vindicate a protection against unreasonable searches and seizures generally, for the overwhelming majority of searches (the warrantless ones) was not covered by the law. Even with respect to that small residuum of searches authorized by warrants and, therefore, covered by law, the new law did not create an exclusionary rule. The gambling cases already had the benefit of the Bouse Act and did not need a new law for such a purpose. Beyond the Bouse Act, the common law recognized no exclusionary rule for otherwise competent evidence.[5] In 1973, Maryland repealed even the limited Bouse Act.

The central purpose of the new law was to set out the requirements for obtaining a search warrant. It provided that only a judge could issue such warrant. It required that the application for the warrant not only be under oath (thereby paralleling the Fourth Amendment) but also that it be in writing and that it be signed (something not required by either the Fourth Amendment or Article 26 of the Maryland Declaration of Rights). It further required that

---

**4.** Ch. 194 of the Acts of 1929. For representative cases interpreting the Bouse Act, see Marshall v. State, 182 Md. 379, 35 A.2d 115 (1943); Delnegro v. State, 198 Md. 80, 81 A.2d 241 (1951); Salsburg v. State, 201 Md. 212, 94 A.2d 280 (1953), aff'd, Salsburg v. Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954).

**5.** Lawrence v. State, 103 Md. 17, 63 A. 96 (1906); Meisinger v. State, 155 Md. 195, 141 A. 536 (1928); Lambert v. State, 196 Md. 57, 75 A.2d 327 (1950).

the warrant be based upon probable cause (again paralleling the Fourth Amendment). It, however, limited its coverage to search warrants, whereas both the Fourth Amendment and Article 26 cover arrest warrants as well. The new law concluded with the requirement that there be reasonable particularity of description of the place to be searched (again paralleling the Fourth Amendment) but strangely did not expressly require (as does the Fourth Amendment) particularity of description with respect to the things to be searched for and seized. The next sentence did, however, provide that property be returned if it "is not the same as that described in the warrant."

After setting forth the requirements for the issuance of a valid warrant, the new law went on to provide two circumstances under which the property that had been taken should "be restored to the person from whom it was taken": (1) if "it appears that the property taken is not the same as that described in the warrant," or (2) if "there is no probable cause for believing the existence of the grounds on which the warrant was issued."

The second of these sets of circumstances led to the practice that was for the next few decades referred to as "Quashing the Warrant." If there was a structural defect in the warrant itself, because it was not issued by a judge, was not appropriately signed and in writing and sworn to, was not based upon probable cause, or did not particularly describe the place to be searched, then the warrant was "quashed" and the search executed under authority of it was deemed not lawful. In cases of gambling and other minor misdemeanors, such a quashing of the warrant operated coincidentally to exclude all evidence, under the then current provisions of the Bouse Act. In cases of felony and nonexempt misdemeanors, on the other hand, the quashing of the warrant did not operate to exclude the evidence, if the State had had the prescience to make copies or photographs of it or had sufficient recollection to testify about it from memory. With the quashing of the warrant, however, the physical evidence itself was returned to the person from whom it had been unlawfully taken.

The first set of circumstances, by contrast, involved no defect in the issuance of the warrant at all but only a defect in its execution. If in conducting an otherwise lawful search pursuant to a good warrant, the police seized not only the evidence that had been reasonably described but other evidence which had not been reasonably described, they were required to return the latter to the person from whom it had been seized. This section of the law was frequently resorted to following police raids on lottery headquarters and bookmaking parlors. In such raids, even under good warrants, there was frequently seized not only gambling paraphernalia itself but also sizeable amounts of cash. It was not uncommon for defense attorneys routinely, following the convictions of their clients and the impositions of minor fines and suspended sentences, to petition the court some days or weeks after trial for the return of the cash, on the grounds that it had not been described as the object of the search.[6]

In a nutshell, the new law did not purport to represent a broad coverage of the field of search and seizure. It did not, moreover, directly treat the exclusion of evidence; it simply provided a partial predicate for whatever exclusionary rules were otherwise available.

The first significant change in the law was made eleven years after its enactment. Chapter 81 of the Acts of 1950 added a third requirement for the valid execution of a warrant. It provided that even a valid warrant must be executed within fifteen calendar days of its issuance and that after the expiration of the fifteen days, the warrant should be null and void. It further provided that the failure to comply with this provision would cause the seized property "to be restored to the person from whom it was taken," just as in the case of the other forms of noncompliance.

---

**6.** Periodic abuses in this *ex parte* petitioning for the return of funds, mostly in lottery and bookmaking cases, led to the additional requirement now found in § 551 (a) and § 551 (c) that the normal procedure will be by written "petition and an order to show cause" but that if the judge decides in his discretion to entertain an oral motion "*made in open court,*" the subsequent "order of the court shall be in writing and a copy of the order shall be sent to the State's Attorney."

This requirement in the seach warrant law was of sub-constitutional status, since neither Article 26 of the Maryland Declaration of Rights nor the Fourth Amendment included such a requirement. The Fourth Amendment Exclusionary Rule, even after it was held binding on the states in 1961,[7] would not apply to a violation of this provision, since the Exclusionary Rule of *Mapp,* of jurisdictional necessity, can apply only to a violation of federal law and not of state law and only to a violation of the United States Constitution and not of a mere statute.[8] Clearly, the new provision created a possible instance of statutory noncompliance where the return of property was called for but where the exclusion of evidence was not.

The amendment of the law in 1958 [9] was significant not so much for the minor stylistic changes which it made but for other proposed changes which it did not make. The original version of House Bill 37 proposed for the first time a broad exclusionary rule for Maryland, not limited in its coverage as was the Bouse Act and anticipating *Mapp v. Ohio* by a full three years. The proposed amendment provided that a search in violation of § 551 [10] or an unconstitutional search generally would result in the suppression of the evidence produced. The proposed exclusionary rule would have dealt with "unlawful" searches as well as with unconstitutional searches. It would, moreover, have dealt with warrantless searches and seizures as well as with defects in the issuance or execution of warrants. Significantly, for the reading of legislative intent, all of these proposed changes were struck from the bill prior to its enactment.

---

**7.** Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**8.** Ironically, the Bouse Act, although limited to certain nonexempted misdemeanors, operated to exclude evidence "procured by, through, or in consequence of any *illegal* search or seizure" and was not limited to violations of constitutional dimension. *And cf.* Fitez v. State, 9 Md.App. 137, 262 A.2d 765 (1970), and Mills v. State, 12 Md.App. 449, 279 A.2d 473 (1971), *cert. den.,* 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972).

**9.** Ch. 74 of the Acts of 1958.

**10.** By then renumbered as Art. 27, § 551 and placed, as it is still, under the subtitle "Search Warrants."

The divergence between the Exclusionary Rule and § 551 became even more pronounced with the amendments to the Maryland law made in 1975 and 1976. Prior to 1975, § 551 had directed that property "be restored to the person from whom it was taken" only in cases where that taking had been somehow improper, at least illegal if not actually unconstitutional. Chapter 704 of the Acts of 1975 added an additional set of circumstances when property should be returned, one where the initial search and seizure had been perfectly proper but where the criminal case had since been *nol-prossed* or dismissed or had resulted in an acquittal. Under such circumstances, all property "except contraband or any property prohibited by law from being recoverable, may be returned to the person to whom it belongs without the necessity of that person instituting an action for replevin or any other legal proceeding against the agency having custody of the property."

This set of circumstances does not remotely involve the Exclusionary Rule or any other rule of evidence. It is substantive law, not procedural law. It only comes into play after the trial is over or the prosecution otherwise terminated. A prophylactic rule, moreover, aimed (as is the Exclusionary Rule) at deterring future police misbehavior, would have no utility in circumstances such as these where there has been no police misbehavior. This aspect of § 551, furthermore, directs that the property be returned not "to the person from whom it was taken" but rather "to the person to whom it belongs." Here is a significant difference. Here, the rightful owner of stolen property could invoke the benefit of § 551, even following the possible acquittal of the thief. The earlier provisions of § 551, on the other hand, seemed to direct the return of unlawfully seized property to the thief himself (assuming he was the person from whom the stolen goods had been unlawfully seized).

The 1976 amendment[11] added yet a third set of circumstances under which property should be returned.

11. Ch. 704 of the Acts of 1976.

This newly created subsection (c) also dealt with circumstances where initially the property had been "rightfully taken under a search warrant" but where it subsequently "is being wrongfully withheld after there is no further need for retention of the property." Strangely and perhaps inadvertently, this third subsection of the law directs the judge to cause the property "to be restored to the person from whom it was taken," and not, as in subsection (b),[12] "to the person to whom it belongs." Applied literally, this subsection would seem to confer a right upon a convicted thief which would not be available to the rightful owner of the stolen goods.

### Art. 27, § 551 As It Stands Today

Appropriately, § 551 is now codified under the subtitle "Search Warrants." In its present configuration, it, like Gaul, is divided into three parts:

1. *Subsection (a)* performs three essential functions. First and foremost, it legitimates the very investigative technique of the search and seizure warrant. Its basic thrust was not to place curbs on what had theretofore been legal searches but rather to legalize what had theretofore been illegal searches. It was the prevailing legal thought in 1939 that explicit statutory authorization was a necessary precondition for any search warrant other than one to search for stolen goods.[13] In order to

---

12. Created by the 1975 amendment discussed above.

13. "The use of search warrants was a procedure recognized at common law in Maryland. However, as in England, the common law limited its use to the search for stolen goods." Gattus v. State, 204 Md. 589, 599, 105 A.2d 661 (1954). "The State refers us to no statute in force in Baltimore City sanctioning a search warrant in this character of case, and we have found none." Sugarman v. State, 173 Md. 52, 59, 195 A. 324 (1937). Givner v. State, 210 Md. 484, 503, 124 A.3d 764 (1956), referred to "the rather restricted common law concept of the office of a search warrant," and went on to observe, "there is serious doubt as to whether a search warrant is obtainable except under a statute or to search for stolen goods or the like." *See also* Givner v. Cohen, 208 Md. 23, 34, 116 A.2d 357 (1955); Griffin v.

avoid the exclusion of evidence under the Bouse Act, it was necessary to legalize searches for other forms of evidence as well.[14]

The second function of Subsection (a) is to set out a number of requirements (several constitutional and others merely statutory) for the valid issuance of a search warrant and at least one requirement for the valid execution of a search warrant.

The third and final function of Subsection (a) is to provide the sanction of ordering that the seized property "be restored to the person from whom it was taken" for certain instances, *but strangely not all instances,* of noncompliance with those requirements.

2. *Subsection (b)* deals with the situation where "the criminal case . . . is disposed of because of (i) the entry of *nolle prosequi,* (ii) dismissal, or (iii) acquittal." In such cases, "all property . . . except contraband or any property prohibited by law from being recoverable, may be

---

State, 232 Md. 389, 393, 194 A.2d 80 (1963); Asner v. State, 193 Md. 68, 65 A.2d 881 (1949).

Indeed, the notion that a warrant, even one meeting all of the constitutional requirements, was null and void unless specifically authorized by statute (or, under the common law, to search for stolen goods) led to the enactment of special authorizing statutes, such as Art. 27, § 380, to search for machine guns, and Natural Resources Article, §§ 4-1203 and 4-1204, to search for unlawfully caught fish or unauthorized fishing devices. *See,* however, footnote 19, *infra.*

14. An interesting question arises as to whether § 551, with its more rigorous requirements, has preempted the common law search warrant for stolen goods or has simply complemented it. The new law did not explicitly replace the common law warrant, and Maryland, of course, strongly disfavors the repeal of the common law by implication. Maryland Declaration of Rights, Art. 5; Hooper v. Baltimore, 12 Md. 464, 475 (1859); Lutz v. State, 167 Md. 12, 172 A. 354 (1934); Gray v. State, 43 Md.App. 238, 241-243, 403 A.2d 853 (1979); Watkins v. State, 42 Md.App. 349, 400 A.2d 464 (1979); and State v. Gibson, 4 Md.App. 236, 247, 242 A.2d 575 (1968), *aff'd.* 254 Md. 399, 254 A.2d 691 (1969). Reinforcing that general principle is the fact that the Legislature in 1939 was concerned with strengthening gambling investigations endangered by the Bouse Act and was not concerned with larceny investigations, which were totally unaffected by the Bouse Act (at least where the subject of the larceny was of the value of $25 or more — the demarcation point between grand and petty larceny from 1933 through 1952).

returned to the person to whom it belongs" without the necessity for "an action of replevin."

3. *Subsection (c)* provides that "property rightfully taken under a search warrant" must "be restored to the person from whom it was taken" if it is found that the property "is being wrongfully withheld after there is no further need for retention of the property." [15]

Subsections (b) and (c) deal exclusively with possessory rights separate and apart from any question of unconstitutional or otherwise unlawful searches. They are easy to understand and to apply. Subsection (a), on the other hand, is a troubling and a troubled provision in two quite distinct regards.

Its sanction is woefully incomplete when measured against its requirements. Three times it spells out with exactitude the three situations that will trigger its sanction of causing the property to "be restored to the person from whom it was taken." One of those situations deals with a single flaw in the issuance of a warrant; the other two situations deal with flaws in the execution of the warrant. The triggers are explicit: "If ... it appears [1] that the property taken is not the same as that described in the warrant or [2] that there is no probable cause for believing the existence of the grounds on which the warrant was issued or [3] that the property was taken under a warrant issued more than 15 calendar days prior to the seizure."

---

15. In State v. Denten Corporation, 288 Md. 178, 416 A.2d 271 (1980), Judge Rodowsky examines this subsection and explores the meaning of the . phrase "wrongfully withheld." If, following a violation of the motion picture licensing requirement, the State has seized the exhibitor's only copy of a film, it is a case of wrongful withholding not to permit him to make a copy of it to submit to the licensing authority.

*And cf.* Mr. Lucky Messenger Service v. United States, 587 F.2d 15 (7th Cir. 1978) (the withholding by the Government of $65,000 in seized currency, even following a lawful seizure, for 17 months without any charges being filed was held to be a possibly unlawful retention, necessitating a further evidentiary hearing in that regard); United States v. Chapman, 559 F.2d 402 (5th Cir. 1977) (following dismissal of indictment, the IRS returned seized documents to the taxpayer but first made copies for itself; this was held not to have been an unlawful retention).

Only one of the triggers for the sanction — the absence of probable cause — goes to the validity of the warrant's issuance. Yet Subsection (a) has established no less than nine requirements for the valid issuance of a warrant:

(1) that it be issued by a judge;

(2) that the application be in writing;

(3) that it be signed by the applicant;

(4) that it be sworn to by the applicant;

(5) that it be "accompanied by an affidavit ... containing facts within the personal knowledge of the affiant";

(6) that there is probable cause to believe that a crime is being committed or that property subject to seizure is located on a person or in a place; [16]

(7) that the individual or place to be searched be "within the territorial jurisdiction of such judge";

(8) that the warrant be issued to a "duly constituted policeman"; and

(9) that the warrant "name or describe, with reasonable particularity, the individual, building, apartment, premises, place or thing to be searched." [17]

---

**16.** It would thus appear that § 551 would not serve to authorize the type of administrative search warrant contemplated by See v. Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); and Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). *And see* Givner v. State, 210 Md. 484, 124 A.2d 764 (1956), where Chief Judge Brune reasoned that administrative search warrants may be reasonable and valid, notwithstanding their non-authorization by Maryland statute. *See also* Givner v. Cohen, 208 Md. 23, 116 A.2d 357 (1955).

**17.** It was with respect to this particularity requirement that Judge Scanlan observed in Harris v. State, 17 Md.App. 484, 487, 302 A.2d 655 (1973): "The spirit and thrust of the Fourth Amendment and Article 26 of the Declaration of Rights are codified" therein.

A failure to comply with any of the nine requirements would render the warrant unlawful and would have justified the limited exclusionary rule once available under the Bouse Act. Only the failure to comply with requirements 1, 4, 6, or 9 (or, arguably, 7) would be indisputably in violation of the Fourth Amendment so as to justify the Exclusionary Rule of *Mapp v. Ohio.* By way of strange contrast, but by its express terms, the sanction of § 551 is only available for a failure to comply with requirement 6.

Subsection (a) also poses one explicit requirement for the valid execution of a warrant — that it be executed within 15 calendar days of its issuance.[18] The availability of the sanction for that noncompliance is clear-cut. The third trigger also involves a flaw in execution, not a flaw in issuance — where "the property taken is not the same as that described in the warrant." Involved here is not the familiar constitutional requirement that the warrant not be overbroad in its catalogue of things to be searched for. Involved, rather, is a requirement that the things actually seized in the course of executing the warrant be things "described in the warrant," be that description broad or narrow. The prohibition is against gratuitous seizures totally beyond the scope of the warrant. The fault contemplated is that the actual seizure is outside the authority of the warrant, not that the warrant is flawed by inadequate particularization.

A deeper problem with Subsection (a) is that much of its philosophical underpinning, its very language, its flavor and tone are now strangely anachronistic. It is a product of an earlier time when search and seizure analysis was far less sophisticated than it has become in the last twenty years. Some of its notions about quashing warrants and returning property simply cannot be reconciled with modern constitutional thought.

---

**18.** *See* Griffin v. State, 232 Md. 389, 194 A.2d 80 (1963); Donaldson v. State, 46 Md. App. 521, 420 A.2d 281 (1980).

Until the promulgation of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the right of the State to seek and to use evidence was strictly contingent on its ability to establish a superior property right in the evidence. Under the long prevailing "mere evidence rule," [19] the State was entitled to search for, to seize, and to use (1) the fruits of crime (stolen goods), (2) instrumentalities of crime, and (3) contraband, because the State was able to establish a property right in such evidence superior to that of the defendant. The State could not seize and use, on the other hand, "mere evidence" of crime, even under a constitutionally unassailable search warrant, because there was no known theory under which it could assert a superior property right. [20]

This was why the common law of England and of Maryland recognized the search warrant for stolen goods, but no other search warrant. [21] The police were deemed to be

---

**19.** *See* Gouled v. United States, 255 U.S. 298, 309, 41 S.Ct. 261, 65 L.Ed. 647, 652 (1921), and Comment, 20 U.Chi.L.Rev. 319 (1953).

**20.** In Gouled v. United States, *supra,* the Supreme Court had held, at 255 U.S. 309, 65 L.Ed. 652, that warrants "may be resorted to only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or when a valid exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken."

The theory was well summarized by Warden v. Hayden, at 387 U.S. 303, 18 L.Ed.2d 790:

"[H]istorically the right to search for and seize property depended upon the assertion by the Government of a valid claim of superior interest, and that it was not enough that the purpose of the search and seizure was to obtain evidence to use in apprehending and convicting criminals. The common law of search and seizure after Entick v. Carrington, 19 How.St.Tr. 1029, reflected Lord Camden's view, derived no doubt from the political thought of his time, that the 'great end, for which men entered into society, was to secure their property.' "

**21.** An examination into the "why" and not just the "what" of the common law in this regard indicates that a reappraisal and a reinterpretation on our part is due. It may not have been the case, as our earlier decisions thought they observed, that the common law limited the use of search warrants to searches for stolen goods. That may understandably have appeared to be the case. It more probably was the case, however, that the common law recognized the technique of the search warrant generally for whatever class of evidence was, at a given moment in our legal history, legitimately subject to governmental seizure. During

the repossession agents of the true owners. Since the property right of the owner was superior to that of the thief, so was that of the agent of the owner.[22] Gradually, other theories were developed to carve out other entitlements to evidence on the part of the State.[23] With respect to contraband, the law recognized no right of private ownership, and the defendant was thus bereft of any theory under which to seek repossession of even unlawfully seized contraband. With respect to instrumentalities of crime, the ancient law of deodand ("it should be given to God") was resuscitated to explain such forfeiture (first to God; after 1536, to the King; after 1776, to the State).[23A] Beyond "fruits,

---

the time period which we have observed, the only member of that class happened to be "stolen goods." When we conclude, therefore, that the common law only recognized search warrants for stolen goods, the limitation was more likely upon the object of the search rather than upon the modality of the searching. The hard data yield this interpretation as surely as they yield the interpretation made by some of the older Maryland cases. The state of legal analysis generally has now reached the point where we can understand that the limitation was simply a function of the "mere evidence" rule as it was then perceived. This understanding was simply not available to the observers of the 1930's and 1940's.

As a legitimatization, therefore, for warrants to search for other than stolen goods, § 551 may have been redundant. Its limitations upon the issuance and execution of warrants, of course, would still have significance even if its purported authorization of the warrant process itself was unnecessary.

**22.** Warden v. Hayden observed, at 387 U.S. 303, 18 L.Ed.2d 790:

"Warrants were 'allowed only where the primary right to such a search and seizure is in the interest which the public or complainant may have in the property seized.' Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 133-134. Thus stolen property — the fruits of crime — was always subject to seizure."

**23.** As Warden v. Hayden further observed, at 387 U.S. 303, 18 L.Ed.2d 790:

"[T]he power to search for stolen property was gradually extended to cover 'any property which the private citizen was not permitted to possess,' which included instrumentalities of crime (because of the early notion that items used in crime were forfeited to the State) and contraband. Kaplan, *Search and Seizure: A No-Man's Land in the Criminal Law,* 49 Calif.L.Rev. 474, 475."

**23A.** See, for example, Art. 27, § 297(a)(4) (providing for the forfeiture of all "conveyances including aircraft, vehicles or vessels, which are used, or intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [narcotics]" Art.

instrumentalities, and contraband," everything else was "mere evidence" and was beyond the pale of seizure or use by the State.

The language of the Maryland statute reflects these earlier distinctions. The warrant authorized by § 551 is not addressed to evidence generally but to "property subject to seizure." Subsection (b) carefully exempts from its restoration provision "contraband or any property prohibited by law from being recoverable."

The whole theory of the entitlement of the State to seize, to retain, and to use personal property that has utility as evidence of crime changed dramatically with *Warden v. Hayden.* The Supreme Court squarely abolished the "mere evidence rule" and recognized that whatever historical validity the old property theories might once have had, they were totally obsolete. "The premise that property interests control the right of the Government to search and seize has been discredited." *Warden v. Hayden,* 387 U.S. at 304, 18 L.Ed.2d at 790. "Nothing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband." *Id.* at 301, 18 L.Ed.2d at 789. "We today reject the distinction as based on premises no longer accepted as rules governing the application of the Fourth Amendment." *Id.* at 300-301, 18 L.Ed.2d at 788.

In the course of enunciating this doctrinally new rationale for the State's entitlement to seize and to use evidence, the Supreme Court recognized that the right to have evidence suppressed did not necessarily entail the right to have property returned and, conversely, that the right to have property returned did not necessarily entail the right to have evidence suppressed. It pointed out that "suppression might be sought during a criminal trial, and under circumstances

27, § 36 (providing for the forfeiture of handguns and ammunition serving as the instrumentalities for violating § 36B); Art. 27, § 264 (providing for the forfeiture of any money, currency, or cash serving as the instrumentality for violations of the gambling laws in Baltimore City and Anne Arundel County); Art. 33, § 24-25 (providing for the forfeiture of any money serving as the instrumentality for an unlawful wager on an election result).

which would not sustain an action in trespass or replevin." *Id.* at 305, 18 L.Ed.2d at 791. In tracing the right to have derivative evidence suppressed established by *Silverthorne Lumber Company v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), it pointed out that suppression was there appropriate, "although no possible common law claim existed for the return of the copies made by the Government of the papers it had seized. The remedy of suppression, necessarily involving only the limited, functional consequence of excluding the evidence from trial, satisfied that demand." 387 U.S. at 305, 18 L.Ed.2d at 791.[24]

For present purposes, the key distinction made by the Supreme Court was that the remedy of having property returned and the remedy of having evidence suppressed do not necessarily go hand in hand:

> "For just as the suppression of evidence does not in itself necessarily entitle the aggrieved person to its return (as, for example, contraband), the introduction of 'mere evidence' does not in itself entitle the State to its retention. Where public officials 'unlawfully seize *or hold* a citizen's realty or chattels, recoverable by appropriate action at law or in equity . . . ,' the true owner may 'bring his possessory action to reclaim that which is wrongfully withheld.' " (Emphasis in original.) *Id.* at 307-308, 18 L.Ed.2d at 792.

What emerges is the governmental policy that, subject only to the constitutional limitations imposed through the Exclusionary Rule, the State derives its entitlement to seize, to hold, and to use personal property from the very utility of that property as evidence of crime. Utility as evidence is all the justification the State needs to assert control over the property. Stolen goods are seized primarily to prove larceny, not to recover the chattels for the victim. Contraband is

---

**24.** *And see, e.g.,* United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), where evidence was suppressed but property was not ordered returned.

seized primarily to prove unlawful possession, not to destroy it. The instrumentality of death is seized primarily to prove the murder, not to forfeit it to God, King, or State. With the new analysis, all evidence, including what had once been "mere evidence," is controllable by the State simply by virtue of its evidentiary utility. *Warden v. Hayden* concluded unequivocally:

"The premise in *Gouled* that Government may not seize evidence simply for the purpose of proving crime has likewise been discredited. The requirement that the Government assert in addition some property interest in material it seizes has long been a fiction, obscuring the reality that government has an interest in solving crime." *Id.* at 306, 18 L.Ed.2d at 791-792.

The remedy provision of Subsection (a) of § 551 is out of step with this modern constitutional thought on the right of the State to seize and to use evidence of crime. The "interest in solving the crime" establishes the public's entitlement to evidence of crime. Yet, Subsection (a) mandates the return of property seized under a warrant executed more than fifteen days after its issuance, despite the fact that the evidence would have utility in the State's case in chief on the merits of guilt or innocence. (The Exclusionary Rule would not bar it, for the violation was not of constitutional dimension). Even where the flaw in the issuance of a warrant (such as the lack of probable cause) would trigger the Exclusionary Rule as well as the remedy of Subsection (a), the Exclusionary Rule would go only to the use of such evidence in the State's case in chief. That evidence would still have social utility for submission to a grand jury, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); that evidence would still have social utility on rebuttal for purposes of impeaching the defendant's testimonial credibility, *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); that evidence would still have social utility in the trial of a codefendant who had no standing to object, *Rakas v. Illinois,*

439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In significant ways, the Maryland statute and the Exclusionary Rule are at cross-purposes. Granting the right of a sovereign state, perhaps inadvertently, so to limit its ability to enforce its criminal laws, it is blatantly apparent that the mere availability of the remedy under § 551 (a) does not, *ipso facto,* demonstrate, the right to have evidence suppressed under the Exclusionary Rule, or vice versa.

An overly literal reading of Subsection (a)'s command that only items described in the warrant may be seized, moreover, collides with the theory of *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), that even if a warrant prove bad, the State may still fall back upon alternative warrantless theories to justify the use of the seized evidence even in its case in chief. An overly literal reading of Subsection (a) in this regard would also do violence to the Plain View Doctrine enunciated by *Coolidge v. New Hampshire,* at 403 U.S. 464-473, 29 L.Ed.2d 581-587.[25] It is settled constitutional law that if there is a prior valid intrusion to execute a warrant for A, B, and C (described in the warrant), and the police inadvertently spot in plain view D, E, and F (not described in the warrant) with probable cause to believe that D, E, and F are evidence of crime, they may seize D, E, and F and use them even in the case in chief. *Stanley v. Georgia,* 394 U.S. 557, 571, 89 S.Ct. 1243, 22 L.Ed.2d 542, 553 (1969), (Stewart, J., concurring in result); *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *Hughes v. State,* 14 Md. App. 497, 510-511, 287 A.2d 299 (1972). The answer to a literal invocation of Subsection (a) would have to be that one may not seize *under the warrant* things not described in the warrant, but may well seize them under some other Fourth Amendment theory. Under such circumstances, things seized in the course of executing a warrant, even though not described in the warrant, do not have to be returned.

---

**25.** *And see* Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); Brooks v. State, 235 Md. 23, 29, 200 A.2d 177 (1964); and Anglin v. State, 1 Md.App. 85, 88-89, 227 A.2d 364 (1967).

In summation, a close reading of § 551 side by side with the Fourth Amendment yields dozens of major and minor distinctions that are heedlessly plastered over by the slapdash assumption that the Maryland statute is neither more nor less than a legislative embodiment of *Mapp v. Ohio.*[26] What emerges from the analysis is that the federal Exclusionary Rule and the Maryland statute, though overlapping minimally as they touch probable cause and possibly particularity of description, are totally divergent remedies, with vastly diverse histories, serving completely

---

**26.** We ourselves have not been without sin. On at least one occasion, Andresen v. State, 24 Md.App. 128, 169, 331 A.2d 78 (1975), *aff'd,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), we were guilty of the slapdash assumption, as we observed in a passing and uncritical dictum on a peripheral issue that the Fourth Amendment, Article 26 and § 551 "are provisions *in pari materia* and protect like rights in a like manner." We had not yet had occasion, as we now have had, to make the painstaking study of § 551 — its history, its convolutions, its subtleties — and we drew the quick, the easy, and the inaccurate analogy. We do not now overrule, for there was no holding in this regard to be overruled. We simply repudiate a hasty, uncritical, and erroneous overgeneralization.

A statement, moreover, that two laws or two sets of laws are *in pari materia* in one respect does not lead to an inevitable conclusion that they are *in pari materia* in all respects. The Court of Appeals launched just such a semantic boomerang with Wood v. State, 185 Md. 280, 44 A.2d 859 (1945). In *Wood,* the Court observed the similarity between the Bouse Act and the new Maryland law of 1939 (now § 551), on the one hand, and the Fourth Amendment, on the other hand, when it came to the exclusion of evidence that would result from a showing of no probable cause. In *Wood,* it analogized the respective laws without carefully restricting the statement of the analogy to the particular aspect it had in mind. After being hit repeatedly with the overgeneralization, it felt constrained to put an end to the mischief in Rizzo v. State, 201 Md. 206, 210, 93 A.2d 280 (1952):

"We are not infrequently reminded by counsel of our statement in Wood v. State, 185 Md. 280, 285, 44 A.2d 859, 861, that 'The Bouse Act and the Act of 1939 amount to adoption *pro tanto* of the Supreme Court decisions under the Fourth Amendment.' The context shows that the extent of *pro tanto* was the meaning of 'illegal search and seizure' as dependent upon want of 'probable cause.'"

The lesson of *Rizzo* is clear: that even seemingly broad statements should never be taken out of their originating contexts. It is a common semantic fallacy. A perfectly valid statement, made contextually even if not expressly, about a mere part, is not a valid statement about the whole. "'Aha,' said the blind man, feeling the side of an elephant, 'so, an elephant is like a wall.' 'Oh, no,' said the second blind man, feeling the leg of the elephant, 'an elephant is like a tree.' 'You are both wrong,' said the third blind man, feeling the tail of the elephant, 'an elephant is like a snake.'" Statements by appellate courts must be as carefully limited by their contexts as are statements by blind men feeling elephants.

different purposes, utilizable at significantly different stages of legal proceedings, available to different classes of litigants with different problems, and emanating from separate sovereigns. Notwithstanding distinctions that are as prominent as they are numerous, the two provisions of law were tossed back and forth in the proceedings we now analyze with uncritical interchangeability. Their procedures, provisions, and purposes were casually intermingled as if they were no more than mirror images of one another.[27]

## The Proceedings in this Case

### Mrs. H's Motion of March 3

The search and seizure in issue in this case occurred on February 5, 1982. The locus of the search was an outbuilding located on a rural property owned by Mrs. H and her husband. On March 3, Mrs. H filed a motion in the Criminal Court of Baltimore requesting the "Return of Seized Property." It is virtually impossible to determine the strictly legal, as opposed to the rhetorical, basis for the motion. The eight-line motion itself represents that it is filed "pursuant to the Maryland Rules of Procedure, Rule 736."

The 700 Rules regulate procedure in "Criminal Causes." Although many of the established procedures deal with matters "pretrial," they do not deal with matters "pre-criminal cause." There were no charges pending against anyone in this case. There was nothing within the

---

**27.** Much of the blame for the confusion, particularly on the part of counsel for the appellees, would seem to lie in their heavy reliance on decisions from the lower federal courts, particularly those looking to Federal Rule of Criminal Procedure 41(e). Under the federal procedure, totally unlike the Maryland procedure, the two remedies of having property returned and evidence suppressed can go hand-in-hand, involve the same procedures, and emanate from the same sovereign. As we have exhaustively analyzed, the respective remedies in Maryland are sometimes in conflict, involve totally different procedures and forums, and do not flow from the same sovereign source — one is homegrown, the other is imposed from the outside. Much of the federal law cited is, under the circumstances, not only inapposite but affirmatively misleading. Federal procedure has no more, nor less, bearing on Maryland procedure than does the procedure of Arkansas or New South Wales.

jurisdiction of the criminal court. There was no criminal charge to which the 700 Rules would even attach. In holding that the 700 Rules were an inappropriate vehicle to deal with extrinsic, albeit arguably related, matters, *Avery v. State,* 15 Md.App. 520, 537, 292 A.2d 728 (1972), *cert. den.,* 410 U.S. 977, 93 S.Ct. 1499, 36 L.Ed.2d 173 (1973), was very explicit:

> "Md. Rule 701 deals with the interpretation of the Rules set forth in Chapter 700 concerning criminal causes. The suggested dismissal of the indictment is not predicated upon any Rule in Chapter 700 and therefore Rule 701 is not applicable."

A motion to return property is not predicated upon any rule in Chapter 700.

When one looks specifically at Md. Rule 736, stating which motions shall be determined prior to trial, the type of motion contemplated is easily discernible. Subsection a, dealing with which motions must be filed before trial, catalogues five such motions, and each of them clearly contemplates a pending criminal case:

> "1. A defect in the institution of the prosecution;
> 2. A defect in the charging document, other than its failure to show jurisdiction in the court or to charge an offense which defenses can be noticed by the court at any time;
> 3. An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;
> 4. An unlawfully obtained admission, statement or confession;
> 5. A motion for joint or separate trial of defendants or offenses."

The miscellaneous catch-all represented by Subsection c, "Other Motions," clearly contemplates other motions in a pending criminal case of the same type as those spelled out in Subsection a. Subsection c reads:

> "Any other defense, objection or request capable of determination before trial without trial of the general issue shall be raised by motion filed at any time before trial." [28]

Indeed, the very structure of the 700 Rules, dealing first with Charging Documents, then with Initial Processing, with Pleas and Motions, with Matters Preliminary to Trial, with Trial and with Post-Trial Procedure, contemplates some pending criminal case. More specifically, Md. Rule 736 which deals with "Motions Before Trial" contemplates a pending criminal case. Even more specifically, Subsection b, aimed at the five specified mandatory motions (but not without significance for the miscellaneous "Other Motions") provides that they "shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court." The entire context, including reference to the potential moving party as "the defendant," [29] leaves no doubt that everything in the 700 Rules generally, and in Md. Rule 736 specifically, contemplates some action then pending before the criminal court.

Before deciding what kind of a motion was actually before the court in this case — a motion for the return of property or a motion for the suppression of evidence — and before reaching the merits of such motion, we note preliminarily that the motion was filed at the wrong time in the wrong court. As filed "pursuant to the Maryland Rules of Procedure, Rule 736," it (whatever it was trying to do) was premature, because no criminal case was pending so as to engage the gears of the 700 Rules.

---

**28.** As will be more fully discussed at footnote 33, *infra,* a motion for the return of property under § 551 (a) which is filed or heard once criminal charges are pending would appropriately fit within the "Other Motions" dealt with by Md. Rule 736 c. A motion for the return of property under § 551 (a) filed and heard before the pendency of criminal charges, however, would not fall within this rule. The very phrase "before trial" contemplates the pendency of a criminal charge.

**29.** Md. Rule 702b defines "defendant" for purposes of the 700 Rules as "a person who has been arrested for an offense or against whom a charging document has been filed."

The motion was, moreover, erroneously filed in the *Criminal Court* of Baltimore. The criminal court is without jurisdiction to entertain motions prior to the pendency of criminal charges. Even former Md. Rule 729b2 (effective through July 1, 1977), which provided for the return of property which the new 700 Rules (in effect since July 1, 1977) do not, explicitly directed that any motion for the "return of property on the ground it was obtained by an ·unlawful search or seizure," which is filed before indictment or before a defendant has been held for the action of the grand jury, "*shall be filed in a law court* of the county where the property was seized or is being held or where the offense was allegedly committed." (Emphasis supplied).[30] Former Md. Rule 729b2 went on to provide that the State's Attorney of the county in which the proceeding is brought should be named as a party defendant in that civil suit. Former Md. Rule 729b3 went on to provide that jurisdiction should be transferred to the criminal court only in the event that criminal proceedings were commenced after the filing of the petition but before a hearing thereon.

Indeed, the lower federal cases relied upon by the appellees, inapposite generally because they are based upon a legal theory not recognized under Maryland law,[31] also recognize the lack of jurisdiction in the criminal court to entertain a motion for the return of property where no criminal charges are pending. They recognize that under such circumstances, the relief sought is equitable and the

---

**30.** *See* the excellent opinion of Judge Finan in Mace Produce Co. v. State's Attorney for Baltimore City, 251 Md. 503, 506-507, 248 A.2d 346 (1968).

**31.** This line of cases, stemming essentially from Lord v. Kelley, 223 F.Supp. 684 (D.Mass. 1963), refers to an equitable remedy for the return of property unlawfully seized and recognizes a somewhat strained "anomalous jurisdiction" in the federal courts to entertain such petitions. They point out that such anomalous jurisdiction "should be exercised with caution and restraint and subject to equitable principles." They list a number of factors, such as flagrant governmental misbehavior and irreparable harm to the petitioner, which should be considered before determining that compelling circumstances are present for the exercise of the anomalous jurisdiction. We do not go into detail in our analysis of these cases, all mentioned above, *infra,* because the procedure is unknown to Maryland law. Maryland, by way of contrast, has legislatively provided the explicit remedies available under § 551.

petition for the return of property is decided on equitable principles. "[B]efore an indictment is returned (that is, when the criminal prosecution is *in posse* but not *in esse*) the party aggrieved has an 'independent' action . . . Such an action is a civil matter and should be so docketed." *Lord v. Kelley,* 223 F.Supp. 684 (D. Mass. 1963). *See also Pieper v. United States,* 604 F.2d 1131 (8th Cir. 1979); *In Re Nwamu,* 421 F. Supp. 1361 (S.D. N.Y. 1976); *Hunsucker v. Phinney,* 497 F.2d 29 (5th Cir. 1974); *Richey v. State,* 515 F.2d 1239 (5th Cir. 1975).

Lest we be accused of hypertechnicality — the exalting of form over substance — we hasten to point out that the insubstantiality of Md. Rule 736 as a predicate for the motion and the lack of jurisdiction in the criminal court to entertain the motion were the least of the defects in the proceedings below. Assuming, therefore, that the motion was properly brought and was brought in the right court, we go on to matters of more substance.

### a. Considered as a Motion to Suppress Evidence

Although we think it unlikely, it is arguable that the motion before the court was a motion for the suppression of evidence. Several factors tilt decidedly toward such an interpretation. It was brought (even if untimely so) under the 700 Rules, which provide (explicitly under Md. Rule 736) for the suppression of evidence but which do not now provide for the return of property.[32] It was brought, moreover, in the

---

**32.** The appellees cite Rizzo v. State, 201 Md. 206, 93 A.2d 280 (1952), as authority for the proposition that Md. Rule 736 authorizes a motion for the return of illegally seized property as well as a motion to suppress evidence. *Rizzo* is simply no authority for that at all. To begin with, the prevailing Maryland rule referred to by *Rizzo* was not Md. Rule 736 (as it has existed since July 1, 1977) nor even former Md. Rule 729 (as it existed between January 1, 1962 and July 1, 1977) but the then-prevailing Criminal Rule of Practice and Procedure 3(b) (1). That rule was simply the unremarkable provision that "Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion." For precisely the same reasons that we discussed in dealing with the present Md. Rule 736, that earlier rule referred to by *Rizzo,* and the Criminal Rules of Practice and Procedure generally, contemplated the pendency of a criminal charge. The defendant Rizzo and his codefendants were under arrest with criminal charges pending, when the motions were

criminal court. It was brought by a woman who may have owned the outbuilding in which the records were kept but who was not the owner of the seized records and would, therefore, not seem to be an interested party to a dispute over the rightful possession of the chattels. Most significantly, however, almost all of the argument in the six pages of memorandum supporting the motion "sounds" in constitutional law and not in the explicit provisions of § 551. Almost all of the cases cited in the memorandum deal with Fourth Amendment protections and concerns. The vindication of the constitutional protections is the primary function of the Exclusionary Rule. Section 551, on the other hand, though concerned, to be sure, with the showing of

---

made in that case. *Rizzo* did not remotely consider whether it would have been appropriate to file or to hear such motions prior to the filing of any charges. That was just not before the court.

The prosecution in the *Rizzo* case was for bookmaking and ultimately would have fallen under the provisions of the Bouse Act, but for the fact that Anne Arundel County, as of 1951, had had itself exempted from the exclusionary rule of the Bouse Act for gambling offenses. The search in that case was warrantless, was apparently unconstitutional, and would have called for the exclusionary rule of Bouse but for the exemption as to Anne Arundel County. The entire concern of the *Rizzo* opinion and the companion opinion of Salsburg v. State, 201 Md. 212, 94 A.2d 280 (1953), *aff'd*, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954), was with the constitutionality of the Anne Arundel County exemption under the Equal Protection Clause.

Since the search in question was not pursuant to a warrant, the predecessor section to § 551 (a) was not remotely involved. The defendants' motions were straight Bouse Act motions, which the trial court denied because of its ruling that the Bouse Act was unavailable in Anne Arundel County. Nothing in the *Rizzo* opinion analyzes or discusses the propriety of a motion for the return of property. It mentions, simply in describing briefly the procedural history of the case, that the defendants petitioned to have their property returned. The opinion, without comment, simply treats this as an invocation of the exclusionary rule of the Bouse Act, as it goes on to its central concern of examining the constitutional propriety of certain counties' exempting themselves from the Bouse Act. To argue, as do the appellees, that *Rizzo* "held" that the rule about settling certain matters pretrial "in fact did authorize beyond any question, motions for return of illegally seized property" is patently fallacious.

If otherwise appropriate, a motion for the return of property under § 551 (a) following the filing of criminal charges may, of course, be determined pretrial under the now prevailing provisions of Md. Rule 736c. If not otherwise appropriate, as already discussed at great length, no authority to file such a motion emanates from this mere scheduling provision. *Rizzo* dealt with a Bouse Act motion while criminal charges were pending; in our case, there is no Bouse Act and there were no criminal charges pending.

probable cause, is also concerned with statutory requirements that are not constitutional and with rights of possession which are not contingent upon a finding of unconstitutionality in the first instance. Whatever the motion may have been, the argument in support of it is so predominantly constitutional in tone as to give rise to the real possibility that it was a motion to suppress evidence.

Considered as such, the motion was demonstrably without merit. It might well have developed that the Hospital or the Nursing Home, as corporate entities, or various doctors or administrators connected with those institutions would have been the ultimate indictees and not Mrs. H herself. Under the circumstances, she would clearly have no standing to move for the suppression of evidence. Even if Mrs. H had ultimately become a criminal defendant, it is by no means clear that she, as the owner of an outbuilding which had been leased to the Hospital, had a Fourth Amendment interest in "the place searched" and, therefore, standing to object.

Even if Mrs. H had had standing of every possible variety, moreover, the recipient forum for the seized evidence in this case was a grand jury and not a criminal court on the merits of guilt or innocence. Even to vindicate the loftiest of constitutional ideals, we do not suppress evidence at the grand jury level. *United States v. Calandra,* 414 U.S. 338, 351-352, 94 S.Ct. 613, 38 L.Ed.2d 561, 573 (1974), was unequivocal in this regard:

> "Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal.... We therefore decline to embrace a view that would achieve a speculative and undoubtedly minimal advance in

the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury."

Even if we had moved beyond the grand jury stage to the trial stage, even if Mrs. H had been indicted, and even if Mrs. H otherwise had standing, the State, even following a showing of clear unconstitutionality, would not have been barred from the possible use of the seized evidence on rebuttal for impeachment purposes. In this regard, *United States v. Havens,* 446 U.S. 620, 627-628, 100 S.Ct. 1912, 64 L.Ed.2d 559, 566 (1980), was equally unequivocal:

> "We also think that the policies of the exclusionary rule no more bar impeachment here than they did in *Walder, Harris,* and *Hass.* In those cases, the ends of the exclusionary rules were thought adequately implemented by denying the government the use of the challenged evidence to make out its case in chief. The incremental furthering of those ends by forbidding impeachment of the defendant who testifies was deemed insufficient to permit or require that false testimony go unchallenged, with the resulting impairment of the integrity of the factfinding goals of the criminal trial. We reaffirm this assessment of the competing interests, and hold that a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt."

As constitutional analysis slowly evolves, it is this latter appreciation that even unconstitutionally seized evidence may well have social utility for impeachment purposes that is reflected in the change of the Maryland 700 Rules that took place on July 1, 1977. Under the former Md. Rule 729,

a finding that property had been "obtained by an unlawful search or seizure" could lead concomitantly to the exclusion of the evidence and to the "return of such property." Under the new 700 Rules, Md. Rule 736 provides for the suppression of evidence but no longer provides for the return of property.[33] Quite to the contrary, Md. Rule 736g2 goes on to provide explicitly:

> "If the court grants a motion to suppress evidence, the evidence shall be excluded and shall not be offered by the State at trial, except that suppressed evidence may be used in accordance with law for impeachment purposes."

There would not, of course, be a suppression of evidence in the first place unless there had been a finding of unconstitutionality. Even in such circumstances, the new rule clearly does not contemplate any automatic return of the property as it goes on to explain that even "suppressed evidence may be used" for impeachment purposes.

To the extent to which the motion now under appellate review operated to exclude evidence from grand jury consideration or from trial consideration, it was granted in error and will be vacated.

### b. Considered as a Motion to Return Property

It is more likely, however, that notwithstanding arguments that "sounded" almost exclusively in constitutional law, Mrs. H intended her motion to be one for the return of seized property. That was, indeed, how it was styled. There was, moreover, a single reference in the six-page memorandum to "the authority of *State v. Denten*

---

**33.** A motion for the return of property under § 551, if filed or heard after criminal charges were pending, might well under such circumstances be one of those "Other Motions" contemplated by Md. Rule 736c but it would be decided strictly according to the criteria of § 551 and not simply as a concomitant remedy with exclusion upon constitutional grounds. As already discussed, a motion under § 551 filed or heard prior to the pendency of criminal charges would not belong in the criminal court, but in a civil court.

*Corporation,* 288 Md. 178, 416 A.2d 271, 276 . . .; Md. Ann. Code Art. 27, § 551(c)(1)." Although *State v. Denten Corporation, supra,* had referred, of course, to Subsection (c)(1), it is obvious that the appellees intended to refer to Subsection (a), and we will treat their supporting memorandum as if it had. We will also look beyond the fact that a § 551 (a) motion filed before the pendency of any criminal charges should have been filed in a civil court and should have named the Attorney General as a party defendant.

As we turn to an exclusive concern with the precise terms of the Maryland statute and as we persist in the perhaps Sisyphian effort to unscramble the doctrinal eggs, we will scrupulously refrain from any consideration of constitutional issues, save only that of probable cause. To the extent to which we examine the existence of probable cause, we will do so not because it is coincidentally a constitutional criterion but only because it has been incorporated as one of the express criteria of the Maryland legislative act. Our concern will be with the legislative intent of 1939 and not with the values of the "Founding Fathers" of 1789. Before going forward with the merits of this purely statutory question, it is appropriate to move several steps forward with the procedural development of the case.

## *The State's Motion Ne Recipiatur*

Treating Mrs. H's motion of March 3 as one brought under § 551, the Attorney General filed on March 8 a Motion *Ne Recipiatur.* That motion set out in verbatim terms the three bases for relief under Subsection (a) and then pointed out that Mrs. H had failed to allege a violation of any of the three requirements that could serve, under the statute, as a basis for the return of the seized property. That motion concluded, "She contends only that the warrant was too general, and while such an allegation, if meritorious, might result in the suppression of evidence offered by the State at trial, it is not a ground for which a court may grant a motion for the return of seized property."

On March 12, Mrs. H filed her Response in Opposition to the Motion *Ne Recipiatur.* Although a large part of it was an effort to avoid the precise terms of § 551 (a) and to treat the Maryland statute as an enforcement device for the broad range of protections under both the Fourth Amendment and Article 26, the response did at least zero in on the question of probable cause and pointed to this as an explicit concern of § 551 (a).

## The Hospital's Motion of March 12

On that same day, the Hospital filed its Motion for Return of Seized Property. Its brief memorandum in support thereof adopted and incorporated by reference the earlier memorandum filed by Mrs. H. The addition of the Hospital as a moving party was a proper step toward the solution of any standing problem the movants may have had. Although § 551 (a) is by no means crystal clear on the subject, since the party to whom unlawfully seized goods must be restored is "the person from whom it was taken," it would appear that "the person from whom it was taken" would be the party who has standing to file a petition under § 551 (a) in the first instance. Since no evidentiary hearing of any sort was conducted, there was no showing as to who was present when the search and seizure at the outbuilding took place. From the pleadings, however, it appears clear that the records belonged to the Hospital and not to Mrs. H.

Ownership of the goods, of course, does not establish the identity of the party from whom the goods were taken. Since the pleadings further indicate, however, that the outbuilding in question was leased by Mrs. H to the Hospital, it would appear that the Hospital, and not Mrs. H, was the party in rightful possession of the place searched and, therefore, the most likely candidate to fill the role of "the person from whom [the property] was taken." What is revealed, once again, is a very blurred and undifferentiated approach to this whole matter. The position of the appellees, revealed even in their appellate brief, is essentially, "We don't know who has standing, but between Mrs. H and the

Hospital, somebody must have." There is only one problem with the diffuse approach: If the movants collectively prevail, to whom are the goods restored? To Mrs. H? Or to the Hospital?

## *The Ex Parte Injunction of March 19*

There suddenly appeared out of the blue on March 19 an order enjoining the Attorney General "to cease all inspection, examination, analysis and review of all documents and materials seized from the outbuilding . . . and to make no use of the information derived from those documents and materials pending decision by this Court on petitioner's Motion for Return of Seized Property." The Attorney General took, quite properly we think, umbrage at this unanticipated order and within five hours filed, on the same day, a Motion to Dissolve *Ex Parte* Injunction. As the State pointed out in its Motion to Dissolve, "No one in the office of the Attorney General had had any prior notice of the request for this order."

It is clear that what was here involved was an *ex parte* injunction, governed by the BB Rules. Those rules are explicit in the procedural limitations they place on the granting of an *ex parte* injunction. Those rules were not remotely complied with in this case. Rule BB72 a provides, in pertinent part:

> "Any *ex parte* injunction shall not be granted unless it appears from specific facts shown by affidavit, or a verified pleading with or without supporting affidavit or sworn testimony, that immediate, substantial and irreparable injury will result to the applicant before an adversary hearing can be had."

Without reaching the merits, there was an absolute dearth in this case of any affidavit or verified pleading or sworn testimony to support the granting of an *ex parte* injunction. Indeed, the record submitted to us does not even reveal any formal application for the *ex parte* injunction.

Rule BB72 b goes on to provide that an *ex parte* injunction "shall expire by its terms within such time after entry as the court may fix" and that "[s]uch time shall not exceed ten days, in case of a resident." There was no time period set in this case, and the terms of the *ex parte* injunction did not provide for any expiration. It was completely open-ended.

Rule BB72 goes on to provide that the adverse party (the Attorney General) shall be given leave to move for a hearing on not more than two days' notice; that the motion for relief against the *ex parte* injunction "shall be set down for hearing at the earliest possible time"; and that at such hearing, "the applicant who obtained the *ex parte* injunction shall have the burden of showing necessity or propriety of continuing the injunction, and if he does not, the court shall dissolve the injunction."

In this case, the Attorney General never received a hearing to which he was so clearly entitled. Following the March 19 filing of the Motion to Dissolve the *Ex Parte* Injunction, the appellees filed their "Opposition to the Motion" on March 23. On the following day, March 24, the representatives of the Attorney General were notified by the law clerk in this case that the court "had already denied the Motion to Dissolve without any consultation with the State and without granting the State any opportunity to present its views in a hearing."

Although the record once again does not reveal these orders, the responsive pleading of the Attorney General filed on March 29 indicates that the March 23 order of the court denying the Attorney General's motion also contained a second *ex parte* injunction. That March 29 pleading indicated, furthermore, that the Attorney General filed a second motion to dissolve. The record before us reflects no resolution of these matters whatsoever.

We conclude that the issuance of the *ex parte* injunction

was improper and that the failure to grant the State a hearing thereon was also improper.[34]

### The Hearing and Order of April 12

On April 12, the merits of the motion to restore seized property were reached. There was no evidentiary hearing. There was only argument by counsel. Shortly after the conclusion of this hearing on the morning of April 12, the court issued its initial order. There was no opinion of the court, written or oral, from which it is possible to determine the basis of the court's actions. The order first directed that the property seized on February 5 "be returned to the movant." It did not specify which movant this was. The order further denied the Attorney General's Motion *Ne Recipiatur*. The order finally indicated that the court had not decided anything with respect to the scope of either the warrant or its execution as it directed that "the scope of the search warrant issued February 5, 1982 ... shall be reviewed and ruled upon in the jurisdiction where the alleged criminal activity transpired."

In denying the Attorney General's Motion *Ne Recipiatur*, the court gave no direct indication of whether it believed the Attorney General's position (that only the three situations provided for by § 551 (a) could serve as a basis for the restoration of property) was the proper one or whether the

---

**34.** Because of the procedural frailties infecting the *ex parte* injunction, it is not necessary to deal with the substantive issue that the denial to the State of the right "to inspect and to examine" the documents and "to use the information derived from those documents" smacks more of the constitutional considerations guarded by the Exclusionary Rule than of the considerations more pertinent to § 551. Involved here was a classic question of the derivative use of evidence, unripe for determination until the issues of standing and of the constitutional merits were reached.

Our holding with respect to the *ex parte* injunction is by no means moot. It means that any information gleaned from examining the records between March 19 and April 12, even in arguably contemptuous violation of a presumptively correct court order, would not have to be suppressed. (Above and beyond any other consideration, a violation of a court order is not constitutional in dimension so as to invoke the Exclusionary Rule of *Mapp*). The State's actions at a later stage, moreover, would not have to be shown to be uncontaminated by presumptive taint. Even the appellees do not contend that the State would not be free to use any intelligence gathered from the examination of the records prior to March 19.

appellees' position (that the broad range of possible constitutional violations could serve as the basis for the restoration of property) was the proper one. That issue, however, at least did not call for an evidentiary hearing. With respect to that motion, the State had argued if "you rule in the State's favor, of course, we go no further, and it's not necessary to have an evidentiary hearing." The court replied, "Right." The State then went on in its oral argument to point out that if this ruling went against the State, "then we are in a situation where we will have to have an evidentiary hearing." The court seemed to agree. The State here raised expressly the challenge to the movants to prove their standing to object:

> "Obviously, the burden is on the defense to come in and to put on evidence to support that standing. We are here today for an evidentiary hearing that's the law of the State. That's clear that they have to establish that they have standing."

It may have been a relatively simple matter for the appellees collectively to establish standing, but that does not exempt them from the procedural obligation, upon proper challenge, to do so.

The State went on to point out that no question involving the execution of the warrant could be resolved without an evidentiary hearing on the matter of that execution. There was no testimony (and no stipulation) as to the contents of the outbuilding that was searched, as to how many boxes of records may have been lodged therein, as to the location of the boxes that were seized, as to any markings upon them, etc. The manner of the execution of a warrant cannot be determined from the warrant itself. Procedurally, we conclude that the failure to take evidence fatally flawed the order now under review.

Because it is conceivable that the court could have resolved a limited issue or two (notably the existence of probable cause) from a review of the warrant application itself, we will not hinge our reversal exclusively on the failure to conduct an evidentiary hearing.

### (1) The Issue of Probable Cause

The absence of probable cause is, in our judgment, the only issue in this case that could have served as the basis for the return of property under § 551 (a). For two reasons, one substantive and the other procedural, we hold that the court below could not properly have issued the order in this case on the basis of the absence of probable cause.

### (a) Substantively, Probable Cause Was Adequately Set Forth

If the court below had reached the merits on the probable cause issue, it should have, we hold, concluded that probable cause for the issuance of the February 5 warrant was abundantly established. The need for the follow-up search of February 5 was the belief that an affirmative effort had been made on the preceding day to foil the search of February 4 and, thereby, to obstruct justice by "spiriting away" incriminating records and documents prior to the arrival of the searching team. It was the bizarre and highly suspicious behavior of Mrs. H and of four other employees of the Hospital-Nursing Home combination that gave rise to the probable cause to believe that just such an obstruction of justice had taken place.

The Attorney General submitted a thorough and well-drafted eight-page application for the warrant of February 5. The affiant, Robert M. Ward, was a certified public accountant who had been working as an auditor/investigator with the Medicaid Fraud Control Unit for almost two years. He had been assigned for a full year to the investigation of the Hospital and Nursing Home in question. He was intimately familiar with the workings of those two institutions, having reviewed numerous documents that had been obtained by grand jury subpoena and having interviewed numerous witnesses. He was also in daily communication with the Assistant Attorney General who had been for the preceding eight months directly in charge of the investigation. He was in regular communication with Andrew C. Tartaglino, who had been

the Director of the Medicaid Fraud Control Unit for three years and who had previously had twenty-six years experience as an investigator with the United States Government. He was also in direct communication with Richard Simmons, who had been an investigator with the Medicaid Fraud Control Unit for three years, following service of twenty-four years as a detective in the Baltimore City Police Department. The combined expertise of these four was brought to bear on the observations that follow.

All of the investigators were familiar with the fact that the Nursing Home and the Hospital occupied adjacent properties and that the administrative offices of a suspect doctor and the senior staff of the Hospital are located in the basement of the Nursing Home. The principal owners and administrators of both the Nursing Home and the Hospital are the same people. Under investigation was the possibility that funds from both institutions "were used for the personal benefit of [two doctors and administrators] to improve personal residences, maintain an aircraft and for other purposes." Allegations concerned the possibility that personal expenses "were concealed in the accounting records of the Nursing Home and Hospital and that false invoices may have been created."

The affidavit recounted how numerous efforts to subpoena key documents had been frustrated by claims that those documents had been routinely destroyed. The unchallenged search of February 4 revealed the existence of a number of documents that had been claimed no longer to exist.

The investigators were in contact with no less than three confidential sources inside the two institutions. Their veracity was firmly established and the accuracy of their revelations had been confirmed on a number of occasions. It had also been established that Mrs. H was the personal secretary to one of the suspect doctors, was located in an office adjacent to his in the basement of the Nursing Home, and had been engaged in a "cover-up" of activities in his office.

The key to the February 5 probable cause, however, was the activity that immediately preceded the execution of the February 4 warrant. At 10:40 a.m. on February 4, Assistant Attorney General Cassella spoke with the lawyer for the Hospital, who was then in his District of Columbia office. The lawyer was alerted that he should "stand by for an important development." In the course of two other telephone conversations that occurred in the next five or ten minutes (10:45 to 10:50 a.m.), the lawyer asked if a search warrant was to be executed at the Hospital. Mr. Cassella acknowledged that one would be executed "within the next hour."

Confidential source No. 2 revealed that at precisely 10:55 a.m. on February 4, an employee drove a red and white Dodge pick-up truck to the basement door of the Nursing Home, leading directly to the offices of the senior Hospital staff, including one of the key suspects. For the next fifteen or twenty minutes, four employees of the Hospital-Nursing Home, including Mrs. H, were observed loading "numerous cardboard file boxes, known by source No. 2 to be the sort to contain file folders, into the truck and into a blue Cadillac automobile, known by source No. 2 to belong to [Mrs. H]." Approximately ten boxes were loaded into the Cadillac and "many more were loaded into the truck." The source observed "that all of the above-named persons acted in great haste and ran numerous times back and forth between the automobiles and the basement of the Nursing Home carrying said cardboard file boxes." At one point during this activity, the Hospital's public address system summoned another maintenance employee to the suspect doctor's office. That employee "arrived in great haste at the area of the pick-up truck and assisted in the loading of boxes." The pick-up truck and Cadillac pulled away from the institutions at 11:15 a.m., six minutes ahead of the arrival of the searching team at 11:21 a.m. The evacuation had taken twenty minutes. The timing was hardly coincidental.

The application went on to establish indisputably that the records had been taken to the outbuilding, which was then

described with great particularity. Exercising our own reflective, independent judgment, we have no difficulty in concluding that the affidavit amply established probable cause to believe that the five employees in question "were engaged in an effort to obstruct justice by removing files and other evidence relevant to the ongoing investigation from the offices of Doctor ... and his staff in advance of the execution of a search warrant." *State v. Edwards,* 266 Md. 515, 295 A.2d 465 (1972); *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

*(b) Procedurally, the Absence of Probable Cause Was Not Established*

Quite aside from the fact that substantively probable cause was established, there was a procedural flaw in this case that would compel reversal in any event.

We begin with the undisputed proposition that a warrant is presumptively valid. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667, 682 (1978). "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." The burdens of proof (both of producing evidence and of persuasion), therefore, are upon the party who would rebut that presumptive validity. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633, 641 (1980). "Petitioner, of course, bears the burden of proving not only that the search ... was illegal, but also that he had a legitimate expectation of privacy...." *See also United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Tucker v. State,* 244 Md. 488, 497, 224 A.2d 111 (1966), *cert. den.,* 386 U.S. 1024, 87 S.Ct. 1381, 18 L.Ed.2d 463 (1967); *Henderson v. State,* 243 Md. 342, 346-347, 221 A.2d 76 (1966); *Hignut v. State,* 17 Md.App. 399, 413, 303 A.2d 173 (1973).

It was, of course, the petitioners who sought to persuade the court that there was, *inter alia,* a lack of probable cause under § 551 (a) so as to compel the restoration of the seized property "to the person from whom it was taken." The

burden was not upon the State to prove that there was probable cause; it was upon the petitioners to prove that there was not. In this regard, they proved absolutely nothing.

It is manifestly impossible to find that there is no probable cause established by an application for a search warrant without reading that application. In this case, that was not done. In the course of the hearing on April 15, counsel for the petitioners were making reference to an alleged deficiency in the warrant when the court replied:

> "Well, if that warrant was before me, maybe so, but have you ever filed any pleadings in ... County concerning that warrant?"

If there is possible ambiguity in that response, there was no ambiguity at all in the exchange that took place on the following day in the course of the hearing on the State's motion to reconsider:

> "Mr. Charbonneau: Your Honor, as to the propriety or impropriety or the legality or illegality of the search and the sufficiency of the search warrant, the affidavit and the application for the warrant, that issue, as I understand your order, was not resolved by this court. You did not rule on that at this point.
>
> The Court: I never saw the warrant. It was never submitted to me to resolve. I mean, I would like to see it if I could. If I have the jurisdiction to determine the validity, I will be glad to look at it and try to resolve it, and hear argument on it, but no one has ever done that."

Pertinent here are the words of Judge (now Chief Judge) Gilbert in *Campofreda v. State,* 15 Md.App. 693, 699, 292 A.2d 703 (1972): ·

> "We fail to perceive how the trial judge could pass upon the validity of the search when neither the warrant nor a completed copy was offered into evidence."

and also at 15 Md.App. 701:

> "It was impossible for the trial judge to have determined as a matter of law that the search warrant involved in the instant case was legally proper [or improper] when he did not see the warrant."

In the *Campofreda* case at least, a copy of the warrant and the application was read. In the case before us, nothing was read, copy or original. No basis was established for any finding of lack of probable cause, the one sure thing that could trigger the restoration of property under § 551 (a).

### (2) The Scope of the Seizure

With respect to the other possible issue that might in this case have triggered the order to return the seized property, the seizure of property which "is not the same as that described in the warrant," we reiterate our position that § 551 (a) deals with a flaw in the execution of a warrant and not a flaw in the issuance of a warrant.

Substantively, after describing the hurried evacuation of boxes of records from the basement of the Nursing Home, the application concluded that "there are ... numerous cardboard boxes containing files which are evidence of crimes of medical assistance fraud, theft, obstruction of justice, and conspiracy to commit those crimes." The warrant itself not only described certain concealed property, "Namely, 10 or more cardboard file boxes containing files and other business records relating to the operation of [the

Hospital]" but also described the location of those ten or more cardboard file boxes as the "blue Cadillac automobile located on the premises" and the "one-car garage with beige siding located to the left of said dwelling house."

Procedurally, there was neither testimony nor stipulation of fact (only a great deal of written and oral argument) about precisely what was taken, about whether the characteristics of the things seized and the location from which they were seized would fit within the description or not, or about what efforts may have been made (with the assistance of one of the informants or otherwise) to identify which boxes of records had hurriedly arrived on the morning of February 4. There is no evidence as to whether any other boxes or any other records were in the places searched. Even the description of the things to be seized, moreover, which we have recited above, was not before the hearing judge, because he did not read the warrant and did not read the application. One cannot conclude that something "is not the same as that described" without reference to the description.

Once again, the burden was not upon the State to prove that the things seized were the same as those described in the warrant; the burden rather, under the specific terms of § 551 (a), was upon the petitioners to show that the things seized were not the same as those described in the warrant. That is manifestly impossible without reference to the description in the warrant.[35]

---

**35.** Even if we were concerned with particularity of description in the issuance of a warrant (we are not), we recognize the practical limitations. As United States v. Jacob, 657 F.2d 49, 52 (8th Cir. 1981), pointed out:

" 'In contexts that do not involve First Amendment considerations, the test for the necessary particularity is a pragmatic one: "The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved. . . . [T]here is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized." ' "

See also United States v. Davis, 542 F.2d 743, 745 (8th Cir. 1976); United States v. Espinoza, 641 F.2d 153, 165 (4th Cir. 1981); United States v. Torch, 609 F.2d 1088, 1090 (4th Cir. 1979).

Problems of scope and of particularity of description are manifestations of the Fourth Amendment's effort to minimize the necessary intrusion. The

## The Impropriety of the Final Order

Even if reversal were not called for on other grounds, the form taken by the final order would itself compel reversal. Under § 551 (a), the restoration of seized property "to the person from whom it was taken" is either called for or it is not. There is no twilight zone.

The order in this case, following the denial of the State's motion for reconsideration and following the denial of the State's request for a stay of thirty days, was modified so as to direct that the property be returned to counsel for the movants by whom the documents would be kept sealed and housed in a bonded warehouse, where they would not be copied, nor removed, nor tampered with. That order was subsequently amended yet again on April 22 to provide that limited access to the documents would be permitted to personnel of the Hospital, upon timely notice to the Attorney General.

---

command to government is clearly one to do the best it can under the circumstances. Under the circumstances of this case, what the State legitimately sought to seize on February 5 were the boxes of records that the suspects ran away with on February 4. We cannot imagine how the State, faced with such an exigency, could have described the absconding records with greater particularity than it did.

Pertinent here is the reasoning from Schwimmer v. United States, 232 F.2d 855, 862-863 (8th Cir. 1956):

"Relevance and materiality necessarily are terms of broader content in their use as to a grand jury investigation than in their use as to the evidence of a trial. They must be given practical meaning in relation to the functions which a grand jury is designed to serve and to the realities which are necessary in any expeditious carrying-on of its operations. Thus, a grand jury has no catalog of what books and papers exist and are involved in a situation with which it is attempting to deal, nor will it ordinarily have any basis for knowing what their character or contents immediately are. It can therefore hardly be expected to be able to designate or call for what its exact needs may ultimately turn out to be. And since the path which it is entitled to travel in its search for probable cause has no general limits except those of reasonableness on the entirety of the situation being pursued, it obviously has a right, as against the objection of unreasonable search and seizure, to a fair margin of reach and material in seeking information, not merely direct but also as a matter of possible light on seemingly related aspects whose significance it is seeking to uncover. Some exploration or fishing necessarily is inherent and entitled to exist in all documentary productions sought by a grand jury."

For seemingly the thousandth time, we labor to keep the contentions and the remedies in this case earthbound. Every effort to pin the appellees down to what precise remedy they seek under what precise statute sees them scuttle off like a squid behind its cloud of ink, except that in this case the cloud is red, white, and blue. We are not involved in the suppression of evidence. We are not involved in vindicating the values of the Fourth Amendment. We are not involved in freezing the status quo. We are simply determining whether property should be returned under § 551 (a) or not. If the answer is no, the State is free to use the evidence directly or indirectly in any way it sees fit, pending possible future suppression at an appropriate time. If the answer is yes, the appellees are free to enjoy the unfettered control of the restored chattels, including, if it pleases them, the staging of a bonfire.[36] What we have instead seems to be a partial return of the property *pendente lite.* Such a remedy generally is not provided by § 551 (a). *A fortiori,* it is not provided when there is no *lite* then *pendente.*[37]

\* \* \*

Whether we have unscrambled the doctrinal eggs is problematical. What is not problematical is that the order in this case is hereby vacated.

> *Order vacated; costs to be paid by appellees.*

---

**36.** Subject only to any "required records" laws not now before us.
**37.** As to the appealability of this order, In Re: Special Investigation No. 231, 295 Md. 366, 455 A.2d 442 (1983) and In Re: Special Investigation No. 236, 295 Md. 573, 458 A.2d 75 (1983) are absolutely dispositive.